IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>and STATE OF ILLINOIS<br><br>   Plaintiffs,<br><br>   v.<br><br>TCI PACIFIC COMMUNICATIONS, LLC.<br><br>   Defendant. | Case No. 23-4218 |

**COMPLAINT**

The United States of America ("the United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the United States Environmental Protection Agency ("EPA"), and the State of Illinois ("the State"), *ex rel.* Kwame Raoul, Attorney General of the State of Illinois on his own motion and at the request of the Illinois Environmental Protection Agency ("Illinois EPA"), file this Complaint and allege as follows:

**NATURE OF ACTION**

1. This is a civil action brought under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and the Illinois Environmental Protection Act, 415 ILCS 5/22.2 and 5/42 (d) and (e), for recovery of the United States' and the State's costs incurred or to be incurred in connection with releases or threatened releases of hazardous substances at or in connection with Operable Unit 4 ("OU4") of the DePue/ New Jersey Zinc/ Mobil Chemical Corp. Superfund Site (the "Site").

1

2. The United States and the State seek to recover certain unreimbursed costs incurred and to be incurred for response activities related to the release and threatened release of hazardous substances at OU4. The United States and the State also seek injunctive relief requiring that Defendant perform the selected remedial actions ("remedy") for the release and threatened release of hazardous substances at OU4. Finally, the United States and the State seek a judgment on liability for response costs at OU4 that will bind any subsequent action or actions to recover further OU4 response costs under CERCLA, 42 U.S.C. § 9613(g)(2).

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action, and the Defendant, under 28 U.S.C. §§ 1331, 1345, and 1367 and 42 U.S.C. §§ 9607 and 9613.

4. Venue is proper in this District under CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the claims arose, and the threatened and actual releases of hazardous substances occurred, within this judicial district.

## PARTIES

5. Plaintiff, the United States of America, is acting at the request of EPA, an agency of the United States.

6. Plaintiff, the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois, is acting on his own motion and at the request of the Illinois EPA.

7. Defendant, TCI Pacific Communications, LLC, is a corporation organized under the laws of Delaware.

## STATUTORY AUTHORITY

8. Where there is a release or threatened release of hazardous substances, CERCLA Section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), authorizes the United States and

the State to recover all incurred costs of removal or remedial action (i.e., "response costs") to the extent such costs are not inconsistent with the National Contingency Plan ("NCP").

9. Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), certain classes of "covered persons," or potentially responsible parties, are strictly liable for the United States' response costs. Responsible parties under CERCLA include the current "owner and operator" of a "facility" and any person "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."

10. CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), provides, in pertinent part: "In any such action [for recovery of costs] . . . , the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

11. CERCLA Section 106(a), 42 U.S.C. § 9606, authorizes EPA to issue a unilateral administrative or judicial order requiring a potentially liable party to take actions to address "imminent and substantial endangerment to the public health or welfare or the environment" resulting from a release or threatened release of a hazardous substance.

12. Where there is a release or threatened release of hazardous substances, Section 22.2(f) of the Illinois Environmental Protection Act, 415 ILCS 5/22.2(f) (2022), authorizes the State to recover all costs of removal and remedial action incurred by the State.

## GENERAL ALLEGATIONS

### The DePue/ New Jersey Zinc/ Mobil Chemical Corp. Superfund Site

13. The Site is in the Village of DePue, Bureau County, Illinois. The Village of DePue has a population of about 1,700 residents and sits north of Lake DePue.

14. From about 1903 until 1989, the Site hosted various industrial operations including primary smelting of zinc ore, lithopone paint pigment production, sulfuric acid and phosphoric acid production, diammonium phosphate fertilizer production, zinc dust manufacture, and secondary zinc smelting.

15. These operations and the disposal of waste associated with them resulted in hazardous substances being released into the environment, including into Lake DePue and the Village of DePue, including residential and public properties.

16. Because of the contamination at the Site, EPA listed the Site on the National Priorities List in 1999. For assessment and cleanup, studies of the Site have geographically divided it into six operable units ("OUs"), numbered OU1 through OU6. The Site and its OUs are shown in the map below:



   a. <u>OU1</u> is the "South Ditch," an area which has historically received contaminated groundwater and surface water discharge from the former location of most industrial operations at the Site (the "Former Plant Site Area") and conveyed this water into Lake DePue. Various toxic metals associated with plant operations have contaminated sediments in OU1.

   b. <u>OU2</u> includes the "Phosphogypsum Stack," a large pile of phosphogypsum, a weakly radioactive waste material from production of diammonium phosphate fertilizer at the Former Plant Site Area. OU2 also includes several water control features. Primary hazardous substances of concern present at OU2 include ammonia, fluoride, sulfate, phosphorus, arsenic, and manganese, in groundwater.

   c. <u>OU3</u> is the Former Plant Site Area. It includes the locations of the former zinc smelting plant and other production operations including lithopone pigment, sulfuric acid, and diammonium phosphate fertilizer production. It includes a "Slag Pile" which contained hundreds of thousands of tons of slag from zinc smelting operations, "Lithopone Ridges" containing tens of thousands of tons of lithopone waste disposed from lithopone production, a former solid waste dump beyond the former plant's fence line, and other features. Studies of the Site have uncovered thousands of tons more of slag waste material buried as fill material throughout OU3. Currently, the slag pile is about 65 feet high and a quarter of a mile long, containing various metals and 750,000 tons of zinc. A water treatment plant to reduce discharges of hazardous substances to the South Ditch is currently active at OU3. Hazardous substances of concern at OU3 include aluminum, arsenic, cadmium, chromium, cobalt, copper, lead, manganese, nickel, silver, vanadium, and zinc, both in soil and groundwater.

d.  OU4 is the subject of this Complaint. OU4 includes the parts of the Village of DePue outside the Former Plant Site Area. OU4 includes soils that Site operations impacted beyond the plant's boundaries within the Village of DePue. This includes hundreds of residential lots, public property, parks, alleys, the school, and other properties. Soils in yards throughout OU4 are contaminated with hazardous substances including lead, arsenic, cadmium, and manganese. The contaminants within OU4 are associated with air emissions from the Former Plant Site Area during operations, and the contents of the Slag Pile and fill materials at the Former Plant Site Area.

e.  OU5 is Lake DePue and its associated floodplain. Hazardous Substances of concern in OU5 include ammonia, arsenic, beryllium, cadmium, chromium, cobalt, copper, cyanide, lead, manganese, nickel, selenium, silver, thallium, vanadium, and zinc, including in floodplain soil, sediment, and/or surface water.

f.  OU6 includes natural and agricultural areas previously considered to be part of OU4, until EPA designated them as OU6 in April 2020.

**Response Actions by the United States and State**

17.  State and federal agencies have been investigating the Site since at least the 1980s, although complaints from the public date back even further. In 1980 and 1983, EPA performed Preliminary Assessments of the Site. Afterwards, EPA and Illinois EPA performed a series of Site Inspections from 1984 to 1993.

18.  During these Site inspections, EPA and Illinois EPA identified several potential sources of contamination within DePue, including, among others, the Slag Pile, the Lithopone Ridges, contaminated soils, lagoons, and phosphogypsum stack ponds. The Slag Pile contained over one million tons of slag from primary zinc smelting operations and the

Lithopone Ridges contained at least 200,000 tons of waste material. Investigators found that all of these sources contained elevated levels of hazardous substances including zinc, lead, arsenic, cadmium chromium, and copper.

19. In 1995, the State of Illinois notified several potentially responsible parties of their potential liability at the Site, including Horsehead Industries, Inc., Mobil Oil Corporation, and Viacom International Inc. These parties entered into an Interim Consent Order ("ICO") in Illinois State Court on November 6, 1995. *People v. Horsehead Industries, Inc.*, 95-CH-18 (Bureau Cty. Ill Nov. 6, 1995).

20. Pursuant to the ICO, the parties performed some immediate response actions such as enhanced site security, dust control and air monitoring, and treatment of certain groundwater and surface water. They also performed Remedial Investigations and Feasibility Studies for the Site, design of all selected remedies, and implemented certain selected remedies, such as the closing the phosphogypsum stack, constructing an interim water treatment plant to receive storm water and contaminated groundwater, and remediating a contaminated runoff ditch. However, the ICO did not include a commitment for a final, Site-wide remedial action. The potentially responsible parties, Illinois EPA, and the Illinois Department of Public Health ("IDPH") also conducted several other investigations focused on the residential areas of OU4, including toxicology, public health, and soil contamination studies.

21. EPA listed the Site on the National Priorities List in 1999, and developed and approved a Site-wide work plan that same year. EPA, IEPA, and the potentially responsible parties have since divided the Site into the six OUs described above. Illinois EPA, EPA, and

the potentially responsible parties have undertaken various response actions at different stages.

22. Illinois EPA approved a Pilot Study Report in 2015 (to serve as the equivalent of a Remedial Investigation) and a Scoping Document in 2015 (to serve as the equivalent of a Feasibility Study) for OU4. The Pilot Study Report indicated that of the 41 properties sampled, 40 properties exhibited concentrations of metals above screening criteria or exhibited Site-related Materials in at least one sample.

23. On May 17, 2017, Illinois EPA executed a final Record of Decision ("ROD") describing the site parcels constituting OU4 and setting forth the selected remedy for OU4. EPA concurred with and signed the ROD on June 23, 2017. The remedy selected in the ROD includes removing contaminated soil from residential yards for stockpile and management on OU3.

24. On October 18, 2019, EPA accepted Illinois EPA's October 16, 2019 request to transfer the technical and enforcement lead role at the Site over to EPA.

25. EPA issued a Unilateral Administrative Order ("UAO") on January 23, 2020, under CERCLA, 42 U.S.C. § 9606(a), to Defendant and CBS/Westinghouse of PA, Inc. requiring them to perform certain removal actions and pay certain response costs at OU4.

**Site Ownership and Operation and Corporate History**

26. The Site is a "facility" within the meaning of CERCLA, 42 U.S.C. §§ 9601(9) and 9607(a).

27. The first industrial operations at the Site were zinc processing. As early as 1903, the Mineral Point Zinc Company ("Mineral Point Zinc"), a New Jersey corporation, acquired property at the Site and constructed a primary zinc smelter. Mineral Point Zinc

produced slab zinc and zinc dust at the primary zinc smelter and used high-sulfur gas from zinc ore roasting to produce sulfuric acid.

28. In 1923, Mineral Point Zinc constructed and began operating a lithopone manufacturing plant. Lithopone's primary use is as a white pigment powder and it is composed of a mixture of zinc and barium compounds.

29. In 1938, the New Jersey Zinc Company, a New Jersey corporation ("New Jersey Zinc–NJ"), acquired all the assets of Mineral Point Zinc in Bureau County, Illinois by deed. Mineral Point Zinc ceased operations and dissolved that same year.

30. From 1938 until 1966, New Jersey Zinc–NJ continued operation of the primary zinc smelter. From 1938 to 1956, New Jersey Zinc–NJ continued to operate the lithopone plant. New Jersey Zinc–NJ operated under the Mineral Point Zinc name until 1955. New Jersey Zinc–NJ produced slab zinc, zinc dust, sulfuric acid, and lithopone.

31. In 1948, New Jersey Zinc–NJ shut down and demolished its zinc roasters and sulfuric acid plant, opting instead to have roasted ore delivered to the primary zinc smelter.

32. In 1956, New Jersey Zinc–NJ ceased production of lithopone paint pigment and demolished the lithopone plant.

33. In 1966, New Jersey Zinc–NJ transferred all of its assets to Zinminco Inc., a Delaware corporation, which changed its name to "the New Jersey Zinc Company, Inc." ("New Jersey Zinc–DE"). New Jersey Zinc–DE was a wholly owned subsidiary of Gulf & Western Industries, Inc., a Delaware corporation ("Gulf & Western–DE").

34. In 1966, New Jersey Zinc–NJ merged into Gulf & Western Industries, Inc., a Michigan corporation ("Gulf & Western–MI").

35. In 1967, Gulf & Western–DE constructed and began operating a diammonium phosphate fertilizer manufacturing plant at the Site.

36. Also in 1967, Gulf & Western–DE constructed an integrated zinc smelting plant which included zinc roasting, sintering, smelting, beneficiation, and casting facilities, as well a facility for producing sulfuric acid for phosphate fertilizer manufacture.

37. After Gulf & Western–DE constructed the integrated zinc smelting plant, a report on the Site operations documented increased emissions of particulate matter and acid mist from the Former Plant Site Area.

38. In 1967, Gulf & Western–MI merged with Gulf & Western–DE, with Gulf & Western–DE being the surviving entity.

39. In 1971, New Jersey Zinc–DE, as a subsidiary of Gulf & Western–DE, ceased operation of the primary zinc smelter and diammonium phosphate fertilizer plant and ended sulfuric acid production, although zinc dust production continued.

40. Beginning in 1972, Mobil Chemical Company, a division of Mobil Oil Corporation, leased the diammonium phosphate fertilizer plant from New Jersey Zinc–DE. Mobil Oil Corporation purchased the diammonium phosphate fertilizer plant from New Jersey Zinc–DE in 1975. Mobil Oil Corporation operated the diammonium phosphate fertilizer plant until it closed the plant in 1978.

41. In 1974, New Jersey Zinc–DE, a subsidiary of Gulf & Western–DE, merged into Gulf & Western–DE, becoming a division of that company.

42. In 1981, Gulf & Western–DE sold the remaining zinc dust operations in DePue to Horsehead Industries, Inc. Horsehead Industries Inc. formed the New Jersey Zinc Company, Inc., a division of Horsehead Industries, Inc. Horsehead Industries, Inc. used the

Site to manufacture zinc dust from secondary zinc sources until it shut down zinc dust production in 1989, ending zinc processing at the Site.

43. In 1986, Gulf & Western–DE changed its name to Gulf+Western Inc. ("Gulf+Western").

44. In 1989, Gulf+Western merged with Paramount Communications, Inc., with Gulf+Western being the surviving entity. As part of the merger, Gulf+Western changed its name to Paramount Communications, Inc.

45. In 1995, Paramount Communications, Inc. merged into Viacom International Inc., with Viacom International Inc. being the surviving entity. Viacom International Inc. was a wholly owned subsidiary of Viacom Inc.

46. Later in 1995, Viacom International Inc. transferred its non-cable assets to Viacom International Services Inc., a sibling corporation which was also a wholly owned subsidiary of Viacom Inc.

47. In 1995, Viacom Inc. sold Viacom International Inc. to Tele-Communications, Inc. After the sale, Viacom International Inc. changed its name to TCI Pacific Communications, Inc.

48. In 2017, TCI Pacific Communications, Inc. changed its name to TCI Pacific Communications, LLC.

49. Defendant TCI Pacific Communications, LLC, New Jersey Zinc–NJ, Gulf & Western–MI, New Jersey Zinc–DE, and Gulf & Western–DE are each a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

**Disposal of Hazardous Substances at the Site**

50. New Jersey Zinc–NJ, New Jersey Zinc–DE, and Gulf & Western–DE have each owned and operated the Site at the time of a disposal of hazardous substances.

51. Disposals of hazardous substances occurred during New Jersey Zinc-NJ's ownership of the Site (1938 to 1966) and operation of the primary zinc smelter (1938 to 1966), sulfuric acid production (1938 to 1948) and lithopone plant (1938 to 1956).

52. Disposals of hazardous substances occurred during New Jersey Zinc–DE's and Gulf and Western–DE's ownership of the Site (1966 to 1981) and operations of the primary zinc smelter and/or zinc dust production plant (1966 to 1981), sulfuric acid production (1967 to 1971), and diammonium phosphate fertilizer plant (1967 to 1971).

53. Disposals of hazardous substances occurred during Mobil Oil Corporation's operation of the Site as a diammonium phosphate fertilizer producer (1972 to 1975).

**Releases of Hazardous Substances at and From the Site.**

54. At times relevant to this action, "releases" and "threatened releases" of "hazardous substances" have occurred at the Site, within the meaning of CERCLA, 42 U.S.C. §§ 9601(14), 9601(22) and 9607(a), including, among other hazardous substances, lead, arsenic, cadmium, and manganese, which are "hazardous substances" within the meaning of CERCLA, 42 U.S.C. §§ 9601(14) and 9607(a).

55. The Slag Pile within the Former Plant Site Area at the Site contains metals and waste materials from primary zinc smelting operations, including hazardous substances such as arsenic, lead, and polycyclic aromatic hydrocarbons ("PAHs"). Metals have contaminated Site soils sediments, and groundwater.

56. The Lithopone Ridges contain piles of waste from lithopone production which includes hazardous substances, including zinc, lead, arsenic, cadmium chromium, and copper which was released into the environment at the Site.

57. The South Ditch has historically conveyed uncontrolled discharges of groundwater and surface water from the Former Plant Site Area to Lake DePue. Investigation of the South Ditch concluded that metals and hazardous substances including arsenic, zinc, copper, cadmium, and lead contaminated thousands of cubic yards of sediments.

58. EPA has determined that the contamination of residential yards and other properties within OU4 is the result of emitted contaminants from the Former Plant Site Area depositing into OU4 soils, wind or water transporting contaminated particulates from the Former Plant Site Area, or someone directly placing hazardous substances in the soils as fill material. The Pilot Study found levels of arsenic and lead above screening levels throughout OU4, and also detected high levels of cadmium, cobalt, iron, and manganese.

**Incurrence of Response Costs at the Site**

59. The United States and the State have incurred "response costs" at the Site, within the meaning of CERCLA Section 101(25), 42 U.S.C. §9601(25), in response to releases and threatened releases of hazardous substances from the property owned and/or operated by Defendant, and in responding to releases and threatened releases of hazardous substances into the environment at and from the Site.

60. The response costs incurred by the United States and the State include costs of investigating releases and threatened releases into the environment at and from the Site, and performing and/or overseeing the ongoing Site remedial work. The United States and the State will continue to incur response costs in connection with the Site.

61. The above-described response costs relating to the Site were incurred by the United States and the State in a manner not inconsistent with the National Contingency Plan, which was promulgated under CERCLA Section 105(a), 42 U.S.C. § 9605(a), and codified at 40 C.F.R. Part 300.

**Successorship Liability of Defendant**

62. TCI is liable under CERCLA for the response actions and response costs associated with the disposal of hazardous substances that occurred during New Jersey Zinc–NJ's, New Jersey Zinc–DE's, and Gulf & Western–DE's respective periods of ownership and operation and the releases of hazardous substances associated therewith.

63. Defendant is a person (and/or the successor to a person) who at the time of disposal of a hazardous substance owned and/or operated a facility at which such hazardous substances were disposed and from which there were releases of hazardous substances, or threatened releases of hazardous substances, which caused the incurrence of response costs, within the meaning of CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2).

## FIRST CLAIM FOR RELIEF

<u>(Cost Recovery by the United States Under CERCLA</u>
<u>Section 107, 42 U.S.C. § 9607)</u>

64. Paragraphs 1–63 are realleged and incorporated herein by reference.

65. Under CERCLA, 42 U.S.C. § 9607(a), Defendant is liable to the United States for all costs incurred and to be incurred by the United States related to the Site that have not been reimbursed, as well as enforcement costs and prejudgment interest on such costs.

66. The United States is entitled to a declaratory judgment on liability against Defendant, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that will be

binding in any subsequent action to recover further response costs incurred by the United States with respect to the Site.

## SECOND CLAIM FOR RELIEF

(Cost Recovery by the State Under CERCLA Section 107, 42 U.S.C. § 9607 and Section 22.2 of the Illinois Environmental Protection Act, 415 ILCS 5/22.2 (2022))

67. Paragraphs 1–63 are realleged and incorporated herein by reference.

68. Under CERCLA, 42 U.S.C. § 9607(a), and Section 22.2 of the Illinois Environmental Protection Act, 415 ILCS 5/22.2 (2022), Defendant is liable to the State for all costs incurred and to be incurred by the State related to the Site that have not been reimbursed, as well as enforcement costs and prejudgment interest on such costs.

## THIRD CLAIM FOR RELIEF
(Injunctive Relief Under CERCLA Section 106, 42 U.S.C. § 9606)

69. Paragraphs 1–63 are realleged and incorporated herein by reference.

70. EPA has determined that there is or may be an imminent and substantial endangerment to the public health or welfare or the environment because of actual and threatened releases of hazardous substances, including lead, arsenic, cadmium, and manganese, into the environment at and from OU4 of the Site.

71. Defendant is liable for performance of the response actions selected in the ROD for OU4 under Sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9606(a), 9607(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State of Illinois, respectfully request that this Court:

1. Enter judgment in favor of the United States and against the above-named Defendant for response costs incurred by the United States, including prejudgment interest, in connection with the above-described response actions relating to the Site;

2. Enter judgment in favor of the State and against the above-named Defendant for response costs incurred by the State, including prejudgment interest, in connection with the above-described response actions relating to the Site;

3. Enter a declaratory judgment of liability against Defendant under CERCLA, 42 U.S.C. § 9613(g)(2), that will be binding on any subsequent action or actions to recover further response costs for the Site;

4. Enter an order under Section 106 of CERCLA requiring the above-named Defendant to perform the remedial design and remedial action selected in the ROD;

5. Award the United States and the State their costs of this action; and

6. Grant such other and further relief as the Court deems just and proper.

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

Dated: Dec. 5, 2023

/s/ Pedro Segura
PEDRO SEGURA
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

        GREGORY K. HARRIS
United States Attorney

By:  /s/ John D. Hoelzer
John D. Hoelzer, IL Bar #6295098
Assistant United States Attorney
United States Attorney's Office

318 South Sixth Street
Springfield, IL 62701
Telephone: (217) 492-4450
Email: john.hoelzer@usdoj.gov

**FOR THE STATE OF ILLINOIS:**

PEOPLE OF THE STATE OF ILLINOIS
*ex rel.* KWAME RAOUL, Attorney
General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos Litigation Division

Dated:  12/4/2023                    BY:  s/Stephen J. Sylvester
                                                                                   STEPHEN J. SYLVESTER, Chief
Environmental Bureau
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I certify that on this date I caused copies of the foregoing to be served on the following individuals by electronic mail:

<u>For Settling Defendant</u>:

Eric J. Sobczak
Executive Vice President and Associate General Counsel
Paramount Global Law Department
Paramount Global
420 Fort Duquesne Blvd., Suite 100
Pittsburgh, PA 15222
Work: 412-642-5633
Eric.Sobczak@Paramount.com

Thor Ketzback
Partner
BRYAN CAVE LEIGHTON PAISNER LLP
thor.ketzback@bclplaw.com


Dated: December 5, 2023                    <u>s/Pedro Segura</u>
                                            Pedro Segura, Trial Attorney
                                            United States Department of Justice
                                            Environmental Enforcement Section
                                            Environment & Natural Resources Division
                                            P.O. Box 7611
                                            Ben Franklin Station
                                            Washington, D.C. 20044
                                            (202) 532-3153
                                            Pedro.Segura@usdoj.gov