UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF ILLINOIS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:23-cv-04218-SLD-JEH |
| TCI PACIFIC COMMUNICATIONS, LLC, | ) ) | |
| Defendant. | ) ) | |

ORDER

Before the Court is the United States of America and State of Illinois's ("Plaintiffs") Unopposed Motion to Enter Proposed Consent Decree, ECF No. 5. *See* Remedial Design/Remedial Action Consent Decree ("Consent Decree"), Not. Lodging Consent Decree Ex. 1, ECF No. 2-1 (detailing the parties' agreement for remediating certain environmental harms). Defendant TCI Pacific Communications, LLC, does not oppose entry of the Consent Decree. *See* Mot. Enter Consent Decree 1; Consent Decree ¶¶ 75–80. For the following reasons, the motion is GRANTED.

**BACKGROUND**

Plaintiffs seek judicial approval of the parties' agreement regarding remedies related to releases or threatened releases of hazardous substances at or in connection with Operable Unit 4 ("OU4") of the DePue/New Jersey Zinc/Mobil Chemical Corp. Superfund Site ("Site"). *See* Compl. ¶¶ 1–2, ECF No. 1. Generally, Plaintiffs seek: (1) to recover their costs—both those already incurred and those that will be incurred—related to responding to releases of pollutants at OU4; (2) an injunction mandating that Defendant perform selected remedial actions at OU4; and (3) a liability judgment that will bind subsequent actions to recover further OU4 response

1

costs.  *Id.*.  The United States of America—acting via the Department of Justice ("DOJ") at the request of the Environmental Protection Agency ("EPA")—invokes its authority under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  *See* 42 U.S.C. §§ 9601–9675.  The State of Illinois—acting via the Attorney General of Illinois on his motion and at the request of the Illinois Environmental Protection Agency—invokes its authority under the Illinois Environmental Protection Act.  *See* 415 ILCS 5/1–5/58.18.

CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quotation marks omitted).  Whenever any hazardous substance is released or there is a substantial threat of such a release, "CERCLA gives the EPA[1] the authority (1) to take direct response action to clean up a site and later seek reimbursement from responsible parties, [42 U.S.C.] § 9604(a), or (2) to require those responsible parties to conduct the cleanup themselves[,] [42 U.S.C.] § 9606(a)."  *Emps. Ins. of Wausau v. Browner*, 848 F. Supp. 1369, 1373 (N.D. Ill. 1994) (footnote omitted), *aff'd*, 52 F.3d 656 (7th Cir. 1995).  Plaintiffs are empowered to seek certain judicial orders related to response actions.  42 U.S.C. § 9606(a); 415 ILCS 5/42(e).  They are entitled to recover their response costs—the costs incurred in implementing or overseeing response actions at a site—from liable parties.  42 U.S.C. § 9607(a); 415 ILCS 5/22.2.  Liable parties include the current owners and operators of a site, as well as those who previously owned or operated the site when hazardous substances were treated or disposed of at the site.  42 U.S.C. § 9607(a)(1)–(4); 415 ILCS 5/22.2(f).

---

[1] Although CERCLA designates the President as the relevant actor, the President may delegate authority under CERCLA to agencies like the EPA.  *See* 42 U.S.C. § 9615; *e.g.*, *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 114 (D.C. Cir. 2010) (citing Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987)).

The EPA may perform a Remedial Investigation/Feasibility Study ("RI/FS"), the purpose of which is "to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives," 40 C.F.R. § 300.430(d)(1), and "ensure that appropriate remedial alternatives are developed and evaluated," *id.* § 300.430(e)(1). The results of the RI/FS dictate the appropriate "Remedy," which is detailed in a Record of Decision. *Id.* § 300.430(f). The Remedy in turn consists of two components—the Remedial Design ("RD") and Remedial Action ("RA") (collectively "RD/RA"). *Id.* § 300.435.

The Site is situated in the Village of DePue, Illinois, and it hosted various industrial operations, such as "primary smelting of zinc ore, lithopone paint pigment production, sulfuric acid and phosphoric acid production, diammonium phosphate fertilizer production, zinc dust manufacture, and secondary zinc smelting," from about 1903 until 1989. Compl. ¶¶ 13–14. These operations and their attendant waste-disposal activities resulted in the release of hazardous substances into the environment, including Lake DePue as well as nearby residential and public properties. *Id.* ¶ 15. The EPA listed the Site on the National Priorities List ("NPL")[2] in 1999. *Id.* ¶ 16. Studies of the Site divide it geographically into six areas, numbering each Operable Unit ("OU"). *See id.* (depicting the OUs on a map). For example, OU3 is the former location of most industrial operations at the Site ("Former Plant Site Area"), including a slag pile containing hundreds of thousands of tons of slag from zinc smelting ("Slag Pile"). *Id.* ¶ 16c. At issue here is OU4, covering off-site soils—including areas within the Village of DePue that are outside the Former Plant Site Area—which are contaminated with hazardous substances like lead, arsenic,

---

[2] "CERCLA requires the EPA to maintain the NPL, which is intended primarily to guide the EPA in determining which sites warrant further investigation. A site's cleanup may not be financed by Superfund monies unless the site is on the NPL." *Village of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 779 (7th Cir. 2008); *see also id.* ("[CERCLA] is often referred to as the Superfund because it also established a large trust fund to advance environmental cleanup goals, including financing governmental response activities at sites where no potentially responsible party can be identified to finance the cleanup.").

cadmium, and manganese. *Id.* ¶ 16d. Those substances are associated with air emissions from the Former Plant Site Area and the contents of the Slag Pile, amongst other sources. *Id.* Defendant is the successor in liability to entities who owned the Former Plant Site Area and/or engaged in industrial operations at the Site from approximately 1938 to1975. *See id.* ¶¶ 26–49, 62–63.

The parties have reached an agreement to address the contamination of OU4. Much of the RD has already been completed under a Unilateral Administrative Order issued by the EPA on January 23, 2020. Br. Supp. Mot. Enter Consent Decree 3, ECF No. 6; *see also* 42 U.S.C. § 9606(a) (authorizing the issuance of such Unilateral Administrative Orders). The Consent Decree requires Defendant to perform the RA pursuant to a Statement of Work ("SOW"). Consent Decree ¶ 6; Appendix B: SOW, ECF No. 2-5 at 1–41; *see also id.* ¶ 5.2 (requiring Defendant to, among other actions, excavate contaminated soil). EPA will oversee Defendant's work at Defendant's cost, effectuated by approving reports and work plans. Br. Supp. Mot. Enter Consent Decree 3–4; Consent Decree ¶ 4 (defining "Future Response Costs"). Defendant will be liable for penalties if it fails to complete work in accordance with the Consent Decree, and the EPA will be empowered to take over the RA if Defendant stops performing its work. Consent Decree ¶¶ 44–51. Defendant will be required to pay the following response costs:

> (1) $368,831.16 in past costs incurred by EPA in connection with the Site up until May 31, 2022; (2) any outstanding State Past Response Costs[]; and (3) future response costs incurred by [Plaintiffs] in connection with the Work Defendant will perform under the Consent Decree, largely consisting of costs EPA will incur in overseeing the Work.

Br. Supp. Mot. Enter Consent Decree 4 (citing Consent Decree ¶¶ 25–27). In return for performing under the Consent Decree and for paying past and future response costs, Plaintiffs will provide Defendant with covenants not to sue under certain environmental statutes. Consent

Decree ¶¶ 52–53. Such covenants are conditioned upon satisfactory performance of the Consent Decree and are subject to reservations, such as liability for additional work which is determined to be necessary based on unknown conditions or new information. *Id.* ¶¶ 54–56.

The DOJ "published notice of the proposed Consent Decree in the Federal Register and solicited public comment during a 30-day period that expired on January 12, 2024." Br. Supp. Mot. Enter Consent Decree 1 (citing 88 Fed. Reg. 86,383 (Dec. 13, 2023)). No comments were received. *Id.* Defendant has signed the proposed consent decree and supports its approval and entry as a final judgment. *Id.* (citing Consent Decree ¶¶ 75–80). Plaintiffs request that the Court approve and enter the Consent Decree. Mot. Enter Consent Decree 2.

## DISCUSSION

### I. Legal Standard

A "district court must approve a consent decree if it is reasonable, consistent with CERCLA's goals, and substantively and procedurally fair." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011), *as amended* (June 17, 2011). "The test is not whether th[e] court would have fashioned the same remedy nor whether it is the best possible settlement." *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 907 (E.D. Wis. 2004). Instead, the court "must defer to the expertise of the agency and to the federal policy encouraging settlement." *George A. Whiting Paper Co.*, 644 F.3d at 372. This deference "is particularly strong where a consent decree has been negotiated by the [DOJ] on behalf of a federal agency, like the [EPA], which enjoys substantial expertise in the environmental field." *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1050 (N.D. Ind. 2001); *see also George A. Whiting Paper Co.*, 644 F.3d at 373; *United States v. Akzo Coatings of Am., Inc.*, 949

F.2d 1409, 1436 (6th Cir. 1991); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).

## II.   Analysis

### A.  Procedural Fairness

"Procedural fairness concerns the negotiation process, i.e., whether it was open and at arms-length." *Fort James Operating Co.*, 313 F. Supp. 2d at 907 (citing *Cannons Eng'g Corp.*, 899 F.2d at 86).  "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86.  An aspect of procedural fairness considers whether the DOJ allowed the public to comment upon the proposed consent decree prior to its submission for judicial approval and whether those comments were thoroughly considered.  *See BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1052; 28 C.F.R. § 50.7 (requiring that prior to the entry of "a proposed judgment in an action to enjoin discharges of pollutants into the environment . . . . the [DOJ] will receive and consider, and file with the court, any written comments, views or allegations relating to the proposed judgment").

Here, the Consent Decree "is the product of arms-length negotiations that were conducted in good faith for over about eleven months," between EPA, DOJ, Illinois, and Defendant, all of whom were represented by counsel and technical representatives.  Guardino Decl. ¶¶ 5–7, Br. Supp. Mot. Enter Consent Decree Ex. 1, ECF No. 6-1.[3]  The broader negotiations between the parties spanned approximately two years and involved the exchange of "numerous drafts, SOWs, and other documents and information."  *Id.* ¶ 6.  The process was "at times, contentious" and

---

[3] Rose Guardino has been the "Remedial Project Manager . . . in the Superfund and Emergency Management Division of the Region 5 offices of EPA" and for the Site since April 2022, and is responsible for "overseeing planning, scope, budget, quality, and schedule of the project and working with the potentially responsible party . . . project manager."  Guardino Decl. ¶¶ 3–4.

"[e]ach party changed from its initial position to reach agreement on a number of issues." *Id.* "The non-monetary terms of the Consent Decree are standard and based largely on EPA's published Model CERCLA [RD/RA] Consent Decree and SOW . . . ." *Id.* ¶ 8 (citing Env't Prot. Agency, *2021 CERCLA RD/RA CD and SOW Model Documents* (last updated Feb. 16, 2024), https://www.epa.gov/enforcement/2021-cercla-rdra-cd-and-sow-model-documents). The DOJ published notice of the Consent Decree and solicited public comments for 30 days, receiving no comments. *Id.* ¶ 9 (citing 88 Fed. Reg. 86,383 (Dec. 13, 2023)). The Court finds that the process utilized to produce the Consent Decree was procedurally fair.

### B. Substantive Fairness

"Substantive fairness concerns concepts of corrective justice and accountability." *Fort James Operating Co.*, 313 F. Supp. 2d at 908 (citing *Cannons Eng'g Corp.*, 899 F.2d at 87). "As long as the measure of comparative fault on which the settlement terms are based is not arbitrary, capricious, and devoid of a rational basis, the district court should uphold it." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003) (quotation marks omitted). "[A] district court should give the EPA's expertise the benefit of the doubt when weighing substantive fairness . . . ." *Cannons Eng'g Corp.*, 899 F.2d at 88. Courts should also consider the policy-based presumption in favor of settlement. *E.g.*, *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1050.

Here, Plaintiffs state that they "carefully assessed the merits of the claims, the costs, risks, and delays in compliance that litigation would likely cause." Br. Supp. Mot. Enter Consent Decree 6. Defendant, as the potentially responsible predecessor in liability, will be held accountable "without imposing the burdens of protracted litigation on all parties." *Id.* The costs which EPA has already incurred will be reimbursed, as will future compliance-monitoring costs, and those "[m]onetary recoveries will be re-deposited in the 'Hazardous Substance Superfund'

and used to fund EPA responses at other contaminated sites." *Id.* (citing 26 U.S.C. § 9507

(establishing the Superfund)).  Finally, settlement avoids "a protracted legal battle over liability

and the appropriate remedy for the Site" between parties with uncertain legal positions, thereby

hastening the remedial process and "forc[ing] the [potentially responsible parties] to get on with

the job and clean up a long-standing mess." *Akzo Coatings*, 949 F.2d at 1435–36.  The Consent

Decree will enable a fulsome response to a long-standing environmental hazard.  *See, e.g.*,

Compl. ¶ 17 ("State and federal agencies have been investigating the Site since at least the

1980s, although complaints from the public date back even further.").  The Court finds that the

Consent Decree is substantively fair.

### C. Reasonableness and Adequacy

Courts may consider many factors bearing on reasonableness and adequacy, such as:

> [T]he decree's likely efficaciousness as a vehicle for cleansing the environment;
> the extent to which it satisfactorily compensates the public for actual and
> anticipated costs of remedial and response measures; . . . the relative strength of
> the parties' litigating positions[;] . . . the availability and likelihood of alternatives
> to the consent decree[;] and the extent to which approval of it serves the public
> interest.

*Fort James Operating Co.*, 313 F. Supp. 2d at 910.  "[D]etailed schedules, required contractual

obligations, [and] reporting requirements" are indicators of reasonableness and adequacy.

*United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 281 (1st Cir.

2000).

Here, the Consent Decree's non-monetary terms are standard and based on model terms.

Br. Supp. Mot. Enter Decree 7.  The RA specifies in exacting detail the steps Defendant must

take to excavate the contaminated soils.  *See, e.g.*, Appendix B: SOW ¶¶ 5.1–5.11 (creating a

process for Defendant's soil removal).  Work is to be performed in accordance with detailed

schedules and contractual obligations, with mandated reporting by Defendant to Plaintiffs.  *E.g.*,

*id.* ¶ 5.6; *Comunidades Unidas Contra La Contaminacion*, 204 F.3d at 281.  Plaintiffs will have

tools to enforce Defendant's compliance with the Consent Decree and if Defendant falls short of

its end of the bargain, the EPA can step in and finish the job at Defendant's cost.  *See, e.g.*,

Consent Decree ¶¶ 11, 22 (specifying a procedure for "Work Takeover" and guaranteeing access

to the financial assurance funds which Defendant is required to provide).  Deferring to the EPA's

expertise, the Consent Decree seems to be a likely efficacious vehicle for remediating this

environmental hazard.  The Consent Decree also compensates the public for remedial and

response costs by requiring Defendant to cover the costs which Plaintiffs have incurred and will

incur.  *Id.* ¶¶ 26–27.  Finally, as explored above, *see* Section II.B, the alternative to the Consent

Decree would be uncertain and protracted litigation, which is less desirable than the certainty

provided by the Consent Decree.  The Court finds that the Consent Decree is reasonable and

adequate.

### D.  Consistency with Statutory Purpose

This final factor considers "the extent to which [the Consent Decree] is consistent with

[the] statute on which the claims are based."  *Fort James Operating Co.*, 313 F. Supp. 2d at 911.

Three broad policy purposes underly CERCLA: (1) "a prompt and effective response to the

problems of national magnitude resulting from hazardous waste disposal"; (2) "those responsible

for problems caused by the disposal of chemical poisons bear the costs and responsibility for

remedying the harmful conditions they created"; and (3) a statutory preference for settlement.

*Id.* (quotation marks omitted).  With its analysis in the preceding sections, the Court has already

concluded that the Consent Decree advances these policy purposes.  *Cf. Cannons Eng'g Corp.*,

899 F.2d at 90 (noting that the factor addressing consistency with statutory purpose "cannot be

viewed in majestic isolation" from fairness and reasonableness).  One final point bears

stressing—by settling this suit, Plaintiffs' enforcement and litigation resources are freed up to address contamination at other sites.  *See* Br. Supp. Mot. Enter Decree 8.  The public interest is therefore furthered as Plaintiffs may utilize those resources to address other releases of hazardous substances.  The Court concludes that the Consent Decree is consistent with the statutory purposes underlying CERCLA.

## CONCLUSION

Accordingly, the United States of America and State of Illinois's Unopposed Motion to Enter Proposed Consent Decree, ECF No. 5, is GRANTED.  As the Consent Decree resolves the pending claims between the parties, the Clerk is directed to enter the Consent Decree and then close the case.

Entered this 22nd day of July, 2024.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE